# In the United States Court of Federal Claims

No. 14-1121C

(E-Filed:  February 15, 2019)

|  |  |  |
|---|---|---|
| STATE CORPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Contract Disputes Act, 41 |
| v. | ) | U.S.C. § 7104(b)(4) (2012); |
| | ) | Termination for Default; |
| THE UNITED STATES, | ) | Motion for Summary |
| | ) | Judgment, RCFC 56(a); Waiver |
| Defendant. | ) | of Default Not Found. |
| | ) | |

R. Dale Holmes, Philadelphia, PA, for plaintiff.

Amanda L. Tantum, Senior Trial Attorney, with whom appeared Chad A. Readler, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Allison Kidd-Miller, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Pietro Mistretta, Assistant District Counsel, United States Army Corps of Engineers, of counsel.

## OPINION AND ORDER

CAMPBELL-SMITH, Judge.

Plaintiff State Corps (also referred to as SC) is an Afghani corporation that was awarded a construction contract for a logistics center in Jariyan al Batnah, Qatar by the United States Army Corps of Engineers (USACE).  See ECF No. 1 at 1-3 (plaintiff's complaint).  Defendant terminated the contract for default, and plaintiff now challenges that decision and seeks additional compensation allegedly due to plaintiff under the terms of the contract.  See id.

Presently before the court are the parties' motions for summary judgment.  In evaluating the motions, the court considered the following:  (1) plaintiff's revised motion for summary judgment, ECF No. 58; (2) plaintiff's proposed findings of uncontroverted facts, ECF No. 59; (3) defendant's response to plaintiff's proposed findings of uncontroverted facts, ECF No. 63; (4) defendant's proposed findings of uncontroverted facts, ECF No. 64; (5) defendant's response to plaintiff's motion and its cross-motion for

summary judgment, ECF No. 67; (6) plaintiff's response to defendant's cross-motion and reply in support of its motion, ECF No. 70; (7) plaintiff's response to defendant's proposed findings of uncontroverted facts, ECF No. 71; (8) defendant's reply in support of its cross-motion, ECF No. 75; and (9) defendant's notice clarifying its proposed findings of uncontroverted facts, ECF No. 77.  The court deemed oral argument unnecessary.

For the following reasons, plaintiff's motion for summary judgment is **DENIED**, and defendant's cross-motion for summary judgment is **GRANTED**.

I.      Background

A.      Contract Requirements and Performance before July 24, 2013

On August 20, 2012, the USACE awarded plaintiff contract number W912ER-12-C-0046 (the contract), to construct the United States Army Central Logistics Extension Center (ARCENT Center) in Jariyan al Batnah, Qatar, and notified plaintiff of the award on August 21, 2012.  See ECF No. 64-1 at 1-3.  The contract provided that:

> The Contractor shall be required to (a) commence work under this contract within 15 calendar days after the dates the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 300 calendar days.

Id. at 20.  The USACE issued its notice to proceed on September 27, 2012, see id. at 90, which resulted in a required completion date of July 24, 2013, see id. at 293-94.

Under the terms of the contract, plaintiff was required to submit for approval a variety of items related to its performance, such as:  (1) "Shop Drawings" ("Drawings, diagrams and schedules specifically prepared to illustrate some portion of the work"); (2) ["]Product Data" showing the "size, physical appearance and other characteristics of materials or equipment for some portion of the work"; (3) "Physical examples of materials, equipment or workmanship"; and (4) "[O]perating and maintenance [O&M] data" for equipment to allow "the safe and efficient operation, maintenance and repair of the item."  Id. at 50-52.  When making such submittals, unless otherwise specified for a particular item, plaintiff was required to allow a minimum of seven calendar days exclusive of mailing time for the USACE's review and approval process.  Id. at 54.

The default clause in the contract states:

> If the Contractor refuses or fails to prosecute the work for any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within

> this time, the Government may, by written notice to the Contractor, terminate
> the right to proceed with the work  . . . that has been delayed.

ECF No. 64-1 at 37.  It further provides that, in the event of a delay in completing the
work:

> [t]he Contractor's right to proceed shall not be terminated nor the Contractor
> charged with damages under this clause, if—
>
> (1)  The delay in completing the work arises from unforeseeable causes
> beyond the control and without the fault or negligence of the Contractor . . .
>
> and
>
> (2)  The Contractor, within 10 days from the beginning of any delay (unless
> extended by the Contracting Officer), notifies the Contracting Officer in
> writing of the causes of the delay.

Id.

Throughout late 2012 and until the expected completion date of July 24, 2013,
numerous issues arose with the contract performance, about which the parties frequently
corresponded.  See ECF No. 64 at 15-19 (defendant summarizing the course of
correspondence); ECF No. 71 at 7 (plaintiff objecting in several instances to the
paraphrasing or characterization of specific correspondence, but not objecting to the fact
of the correspondence).  This course of correspondence included a letter from plaintiff to
the contracting officer, dated June 13, 2013, which reads as follows:

> This is a formal response to the cure notice that was given to State Corps on
> the 3rd of June 2013.
>
> First of all, I would like to apologize on behalf of State Corps that it came
> down to us being issued a cure notice.  This is our first Governmental contract
> in Qatar and we have always tried for successful completion of this project.
> This is no excuse for being behind on the schedule but unfortunately we had
> experienced some challenges at the start of the project which included getting
> the company registered in Qatar and developing our team there.
>
> One of the major challenges we had at the start of the project included the
> base's security requirements and getting badges for our staff which delayed
> our early start and some issues with our previous QCMs and the first Project
> Manager which put the project 110 days behind the schedule in which [] State
> Corps received an unsatisfactory notice of no work performed.

Now we have the right technical team, Hardworking subcontractor and are done with Badge's issues and feel that we are able to complete the project according to the contract requirements and time frame.

Despite the fact that we have had good construction performance onsite during last one month, but faced some issues with our QCM program in Qatar which caused some delay in submittal process of the project, Three weeks ago we brought a change to the QCM position of the project and assigned another QC Manager.  With his knowledge, expertise and leadership, now we feel that submittal process is becoming a smooth process.

Since the Cure Notice, we have received "A" and "B" codes on 10 out of 18 submittals, 5 Have been submitted to COR which are under review and 3 are being worked and will be submitted to the COR in the next couple of days, during the last 10 days our team have been able to submit the majority of the items which needed to be submitted, It can show the adequacy of our team and efforts of State Corps for successful and soon completion of the project.

On the other hand, as indicated in the attachment "Appendix A" almost all of the long lead items have been approved, purchased and will be on site within next one month, which will bring a large improvement to site construction progress.

For more information about how we can overcome the delay and complete the project, you can kindly refer to attached recovery Plan "Appendix A" which clearly shows our plan for next months.

Currently there are a few long lead item submittals that will not meet the current Contract completion date, So State Corps would like to request from the US Army Corps of Engineers if it is possible to exercise for a 30 to 45 days time extension with an updated contract completion date of September 7, 2013.  State Corps is committed to this project and is committed to US Army Corps of Engineers and tries its best to complete this project by any possible mean.

I have personally spoken with the project manager, John Hanen, and he is fully accepted the responsibility of the project being behind.  With the headquarters, as well as the team in Qatar, we've come up with a recovery plan that we feel will accomplish the completion of this project to the highest standards that the US Army Corps of Engineers expects.

I am looking forward to hearing your kind instruction in this regard.

4

Respectfully,

Jawed Haddad
Vice President
STATE CORPS

ECF No. 64-1 at 213-14.  Plaintiff's recovery plan, which was attached to the letter, acknowledged that the "project is 3 week[s] behind schedule," but stated that "this recovery plan has been made in order for us to prove to our client that the project completion on 24th of July is undeniably possible."  Id. at 216.  The request for additional time to complete the project included in this June 13, 2013 letter, is the only such written request that plaintiff made to the contracting officer prior to the project due date, July 24, 2013.  See ECF No. 64-2 at 134 (plaintiff admitting this fact in response to defendant's request for admission).

    In its interrogatory responses, plaintiff identified a variety of alleged delays that occurred entirely or primarily before the July 24, 2013 contract completion date, including:  (1) visa processing delays for its personnel; (2) delays in obtaining a license to operate in Qatar; (3) delays related to base access; (4) delays related to the installation of "Telecommunication Ductbanks"; (5) delays due to Qatari holidays; and (6) delays due to weather conditions.  See ECF No. 64-2 at 103-08.  Plaintiff stated that these delays totaled at least 110 days, plus an additional period of uncertain duration (estimated at more than one week) for the delay relating to the installation of telecommunication ductbanks.  See id.

    Under the terms of the contract, the USACE was required to make monthly progress payments as the work proceeded.  See ECF No. 59 at 2; ECF No. 63-1 at 3.  The USACE made six such payments on the first six estimates submitted by plaintiff.  See ECF No. 59 at 2 (citing estimates submitted between February 11, 2013 and July 15, 2013, copies of which are found at ECF No. 59-1 at 14-50).

    B.    Events after July 24, 2013

    Plaintiff did not complete the project by July 24, 2013.  In a letter to plaintiff dated July 28, 2013, the contracting officer stated:

    Since State Corps has failed to perform within the time required by the terms of the contract, the Government is considering terminating said contract[,] pursuant to the Contract Clause 52.249-10, titled "Default (Fixed Price Construction)" and 52.211-10 "Commencement. Prosecution and Completion of Work[.]"

The US Army Corps of Engineers is writing this letter to formally inform State Corps of the government's intention to pursue "Liquidated Damages" pursuant to the Contract Clause 52.211.12, titled "Default (LIQUIDATED DAMAGES—CONSTRUCTION)[.]"

The legal completion date for this contract has passed and was to be completed on 24 July 2013.

ECF No. 64-1 at 286.  On July 30, 2013, the contacting officer sent a more comprehensive letter repeating her notification to plaintiff that the project was overdue, that defendant intended to assess liquidated damages, and that defendant may terminate the contract for default.  See id. at 287-88.  That letter stated, in relevant part, as follows:

1.   The project completion date was 24 July 2013.
2.   The contractor asked for an additional 30 to 45 days to complete the project.
3.   The contractor's recovery schedule indicates 60 days to 25 September 2013.
4.   The contractor has an exorbitant amount of submittals left to submit, some with time frames for submission that practically cannot be met. Additionally, with the amount of submittals left to submit and in relation to testing & commissioning, I'm doubtful that the contractor can meet the 25 September 2013 date for contract completion.

. . .

1.   The Contractor shall submit a realistic Plan with dates for completing all outstanding submittals.
2.   The Contractor shall submit a realistic Plan on how they intend on completing this project.
3.   The contractor shall submit a realistic Recovery Schedule incorporating:  Remaining Submittals, O&M Manuals, Training, Test Plans and Testing & commissioning activities.

The contract completion date was 24 July 2013.  This letter is also to notify you of the government's intention to assess liquidated damages per contract clause 52.211-12.

You are hereby notified that the Government considers your failure to perform a condition that is endangering completion of this contract in a timely matter.  Therefore, unless this condition is cured within ten (10) days after receipt of this notice, the Government may terminate for default under the terms and conditions of the Contract Clause 52.249-10, titled "Default (Fixed Price Construction)."  If a default occurs in a contract, the contractor

6

is precluded from being awarded future federal government contracts and the result could be very costly for the contractor.  The Government reserves all right under the contract, including the right to terminate for default if the late performance is unexcused.

Id.

On August 13, 2013, plaintiff wrote to the contracting officer stating that "[w]e accept USACE claim on being behind schedule.  The contract has to be closed by July 24 but yet it is on middle stage." Id. at 293.  Plaintiff also represents in the same letter that its updated recovery plan "will be submitted on Aug 13, 2013 for USACE review and this will be our last recovery schedule." Id.  One week later, the USACE sent a cure notice to plaintiff rejecting the recovery plan "as being insufficient to determine a realistic project completion date." Id. at 295.  The USACE also informed plaintiff that "[a]lthough a modest time extension is under consideration by the Contracting Officer, you will likely continue to be in default and subject to liquidated damages," and that "Termination for Default is also being discussed with the possibility that your performance bond will be called." Id.  The USACE then advised plaintiff that it had "the ability to change these outcomes," and provided a list of matters that required immediate attention.  Id.

Plaintiff responded to the USACE's concerns on August 25, 2013, and proposed yet another recovery schedule.  See id. at 297-329; ECF No. 64-2 at 1-5.  On September 4, 2013, the USACE detailed a number of remaining deficiencies in plaintiff's performance and recovery plan and demanded a response within seventy-two hours.  See ECF No. 64-2 at 6-8.  Twelve days later, on September 16, 2013, plaintiff responded to each of the USACE's concerns, and acknowledged, among other issues, that dozens of submittals had not yet been made, and that significant uncertainty remained as to how the fuel system would be installed.  See id. at 9-10.

On September 8, 2013, plaintiff submitted its seventh estimate for the monthly progress payment due for work performed between July 8, 2013 and August 26, 2013.  See ECF No. 59 at 2; ECF No. 59-1 at 51-58.  The estimate reflected a due date of September 22, 2013.  See ECF No. 59-1 at 51.  The USACE failed to make the seventh progress payment by September 22, 2013, and on September 24, 2013, the USACE emailed plaintiff stating:

> We will need you to re-export pay request #7 Dated, 8 September 2013.  This pay request has been inadvertently deleted on our end.  We are aware that there will be interest penalties accrued on our part, due to late processing.  Please notify us as soon as this is accomplished so we can again process the pay application.

ECF No. 59-1 at 59-60.

On September 23, 2013, the contracting officer issued a show cause letter to plaintiff, stating that "[s]ince you have failed to perform within the time required by the terms of the Contract, the Government is considering terminating said contract pursuant to the Clause titled 'Default' of the contract clauses." ECF No. 64-2 at 11.  Therein, the contracting officer explained that "we still do not have an accurate count of the submittals still needed to complete this project" despite plaintiff's repeated promises to complete the submittals.  Id. at 12.  She also noted that plaintiff's proposed "recovery schedule was rejected because it was unrealistic and unachievable within the time[ ]frame of the contract completion date," claiming that plaintiff "simply shifted the dates arbitrarily with no logic to explain why the completion date is slipping every time a schedule was submitted."  Id.  The letter identified several additional problems with the contract performance.  Id.

The show cause letter concluded by affording plaintiff the opportunity to explain its deficient performance.

> Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part.  Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to this office, within ten (10) days after receipt of this notice.  Your failure to present any mitigating circumstances within ten (10) days after receipt of this notice may be considered as an admission that none exist.  Your attention is invited to the respective rights of the contractor and the Government under the contract clause titled "Default" and the liabilities that may be invoked in the event a decision is made to terminate for default.

> Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services thereunder, will be solely for the purpose of mitigating damages, and is not to be construed as a waiver of any rights the Government may have under subject contract.

Id. at 12-13.

The next day, on September 24, 2013, the USACE wrote to plaintiff stating that it had learned that on September 23, 2013, plaintiff's "subcontractor and their subcontractors did not show up on site," and requiring plaintiff to "respond to this office immediately when the subcontractor is coming back to the job site and your recovery plans to complete this project."  Id. at 16.  Also on September 24, 2013, the contracting officer notified plaintiff of the USACE's "intention to begin assessing liquidated damages . . . at the rate of $4,694.00 per day for each calendar day following the contract completion date until the work is completed."  Id. at 30.  She also again repeated that the

"Government reserves all rights under the contract, including the right to terminate for default if the late performance is unexcused."  Id.

In response to the show cause letter, plaintiff outlined a number of factors that it claims contributed to the project delays in a letter dated October 4, 2013, including:  (1) early delays "mainly caused by making preparation and getting company registration in Qatar," which plaintiff contends were out of its control, id. at 43; (2) the fact that its subcontractor "stopped working [o]n this project without any reasonable excuse on September 22, 2013," and the subsequent need to replace the subcontractor, id. at 43-47; and (3) problems with the process of making submittals, that it claimed were still being resolved, id. at 47.  Plaintiff concludes the letter, stating that it "is willing to make any effort to complete the project in a timely manner if USACE allows us to do so."  Id. Plaintiff's response to the show cause letter did not claim that its performance was affected by the USACE's failure to pay the seventh progress payment by September 22, 2013.

The surety for payment and performance bonds on plaintiff's contract was AAUG Insurance.  See id. at 50.  In a letter dated October 23, 2013, the surety expressed its willingness to negotiate an agreement by which it would take over responsibilities under the contract in order to mitigate its damages.  See id. at 51.  The letter stated, in relevant part, as follows:

> In order to do so, State Corps will need to consent to all of the terms of such an agreement, including the payment to AAUG of all amounts under or relating to the Contract and acknowledge that as between State Corps and AAUG, AAUG would now possess any and all rights to receive such payments. This would obviously work towards the completion of the project, which currently is in significant arrears and is currently subjecting your company to daily liquidated damages.
>
> . . .
>
> Frankly, if AAUG is able to successfully take over the now lifeless project under contractual terms that can be agreed upon, State Corps may possibly recognize the mitigation of future additional liquidated damages that continue to accrue.  We strongly suggest you provide such consent immediately.

Id.  The USACE proposed to plaintiff that if plaintiff cooperated in the surety's takeover efforts, the USACE would not terminate plaintiff for default.  Id. at 130  (plaintiff admitting this fact in response to defendant's request for admission).

Plaintiff initially indicated its assent to the takeover arrangement, stating on October 31, 2013, that it would "complete the turnover agreement in couple of days and further we are in close contact with our surety." Id. at 52.  The USACE and the surety signed the takeover agreement on November 7, 2013, but the agreement also required plaintiff's signature. Id. at 70.  Plaintiff, however, "changed course as of 14 Nov[ember]," and "[wa]s not cooperating with the takeover agreement," as of November 15, 2013. Id.

The contracting officer drafted a memorandum for the file outlining the reasons for terminating plaintiff's contract for default.  Id. at 71-72.  The memorandum read, in part, as follows:

> In accordance with FAR 49.402-3, the Contracting Officer must consider the following factors on whether to terminate a contract for default:
>
> a. The terms of the contract and applicable laws and regulations.
>
> Contract clauses 52.236-7, Permits and Responsibilities, 52.249-10 Default, 52.233-1 Disputes, and 52.211-10 Commencement, Prosecution and Completion of Work, among others, were included in the contract[] and apply to the issues attributed to this contractor and his lack of performance. The contract clearly states that the period of performance is mandatory.  In addition, the submittal specifications clearly addressed the requirement of this project and they were not followed. This termination decision is in conformance with this factor.
>
> b. The specific failure of the contractor and the excuses for the failure.
>
> The contractor failed to make progress.  The contract was awarded on August 20, 2012, and notice to proceed (NTP) was issued on September 27, 2012. The contractor is thirteen months into the project and has completed only 80% of the contract requirement. The period of performance was 300 calendar days from NTP which would have been July 24, 2013.  See Cure Notice and Show Cause letter.  There is no reasonable likelihood that State Corps can perform the entire contract effort since the time has elapsed.  This termination decision is in conformance with this factor.
>
> . . .
>
> g. Any other pertinent facts and circumstances.
>
> As stated above, the Surety, AAUG indicates a willingness to attempt to enter into a takeover agreement to get the project completed.  MED will substitute

the surety for State Corp[s] as the prime contractor; the surety will tender a new subcontractor or utilize Pat Engineering (the current principal subcontractor) as the completion contractor; the surety will invoice for work completed by new subcontractor or Pat and will distribute payments. I anticipate that the project can be completed within remaining contract funds with a minimal shift to the right in schedule. There will be no need to engage in re-procurement activities. The contractor has failed to provide under clause 52.249-10 (1) any of the unforeseen causes beyond his control and without the fault or negligence. This termination decision is in conformance with this factor.

DETERMINATION
I have evaluated the above issues and have determined that a Notice to Terminate for Default of contract W912ER-12-C-0046 was considered and determined to be in the best interest of the government.

Id.

On November 18, 2013, the contracting officer notified plaintiff by letter that its contract was being terminated for default. See ECF No. 59-1 at 68-69. The termination letter reads, in its entirety, as follows:

State Corps is hereby found in default under contract W912ER-12-C-0046 awarded on August 20, 201[2]. Effective immediately, your right to further perform under this contract is hereby terminated.

State Corps' response to the Government's Show Cause and Cure Notice did not provide any information that demonstrated it could complete the project within a reasonable time. State Corps did not show that the default otherwise was beyond its control and without its fault or negligence. The following are the acts or omissions constituting the default:

1. State Corps failed to make progress. The contract was awarded on August 20, 2012, and notice to proceed (NTP) was issued on September 27, 2012. State Corps is thirteen months into the project and has completed only 80 percent of the contract requirement. The period of performance was 300 calendar days from NTP which would have been a completion date of July 24, 2013. Despite the Government's repeated attempt to help State Corps, it maintained approximately a 30 percent rejection status on submittals. State Corps continual delinquency of proper submittals has resulted in project delays.

2.      State Corps has falsified documents in its response to the
Government's Show Cause letter.  This falsification further
solidifies the Government's lack of confidence in State Corps'
integrity in contracting or honesty in keeping promises made.

Based on State Corps' inability to provide timely submittals,
falsification of documents, and completing only 80 percent of the contract
requirement, I do not believe State Corps can provide or follow a reasonable
schedule for completion.

I have determined that the failure to perform is not excusable and this
notice of termination constitutes such decision.  State Corps has the right to
appeal this decision under the Disputes clause.

The Government reserves the right to charge any re-procurement costs
associated with any new contract.  The Government reserves all rights and
remedies provided by law or under the contract, in addition to charging
excess costs.  State Corps will be notified at a later date as to the amount of
such excess costs, if any.

This notice constitutes my decision that State Corps is in default as
specified, and is therefore, terminated for default, and that State Corps has
the right to appeal my decision under the Disputes clause.

Id.

On July 6, 2014, plaintiff submitted a claim and request for contracting officer's
final decision challenging the default termination.  See ECF No. 64-2 at 73-84.  Therein,
plaintiff claimed that its "termination was improper, arbitrary, capricious, without factual
support and/or contrary to law.  As such, [plaintiff] asks that USACE convert the
Termination for Default (T4D) to a Termination for Convenience (T4C).  Additionally,
[plaintiff] seeks compensation from USACE in an amount no less than $1,497,466.80."
Id. at 73.

According to plaintiff, it was entitled to an extension of the contract completion
date of 180 days, to and including December 22, 2013.  See id. 79.  It explains this claim
as follows:

SC's start on the project was delayed due to an inability to obtain not only
Visas and operating licenses, but also badges for SC's personnel to access
the installation.  SC timely began processing the requisite paperwork for such
access as evidenced via the details provided above. . . . USACE was aware
the base access approval process takes 30 days.  With that knowledge, SC is

entitled at a minimum to an extension of the Period of Performance of 30 days.  By the facts as displayed here, the actual period of delay, even with SC's diligent efforts and requests for Government assistance, was 60 days.

Combining these two matters, SC's ability to perform under the contract was delayed due to no fault or negligence on the part of SC.  SC was delayed in commencing work by 42-days due to the Qatar Visa and licensing agency issues at the outset, experienced additional Visa issues throughout the project totaling at least another 18 days (total of 60), and throughout the project experienced no less than 60 additional days of delay regarding Visa approvals and 60 additional days of delay due to base access issues.

. . .

It should also be noted that this badging issue was identified to all parties in the technical specifications of the project. At 1.53.4.1, the Government advised that personnel from Afghanistan were not permitted on the base at any time. While SC was aware of this restriction, the Government was equally aware when they awarded the contract that they had awarded it to a contractor primarily consisting of Afghan employees.  As one of the primary complaints against State Corps is the alleged lack of timely performance and/or the failure to properly manage the project, the Government surely had to understand that such impacts should have been expected when awarding the contract to an Afghan company.  While SC did indeed do its best to minimize such impacts by hiring American employees and a subcontractor comprised of nearly entirely (90%) Indian workers, managers and technical staff, even those solutions lead to unnecessary delays due to base access as explained in this submission—all of which was due to no fault or negligence on the part of SC.

Therefore SC was entitled to an extension of the Period of Performance of no less than 180 days, thus serving to negate, at least in part, any default per 52.249-10.  An extension of 180 days would have set the CCD at December 22, 2013.  On the date of termination, November 18, 201[3], when the project was over 80% and closer to 85% complete, worst case scenario a delay in performance, if any, was negligible at best[].

Id. at 78-79.  Plaintiff also blames the USACE for its lack of progress on the project:

[The USACE's] hindrance manifested itself when the Government failed to properly pay SC for its progress on the project (exacerbating issues with its subcontractor, PAT - see below), in the Government refusing to grant SC access to the installation once it had to step in to take over the project from

13

PAT, in the Government's failure to provide any feedback as to the unsuitability of any corrective action plans submitted by SC, and in the Government failing to support SC's hiring of a replacement subcontractor.

Id. at 80.

II.      Legal Standards

    A.      Motions for Summary Judgment

According to the Rules of the United States Court of Federal Claims (RCFC), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power, 16 F.3d at 1202 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial. Celotex, 477 U.S. at 324.

The Supreme Court of the United States has instructed that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for [the fact-finder] to return a verdict for that party." Id. at 249 (citation omitted). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

B.     Termination for Default

Under the Contract Disputes Act, the court reviews a contracting officer's decision de novo.  See 41 U.S.C. § 7104(b)(4) (2012).  When a default termination is challenged in this court, the government bears the burden of justifying the termination.  E.g., Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987).  Once default has been established, plaintiff bears the burden of establishing that the default was excused by fault of the government.  See, e.g., Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 253 (2007) ("If the government succeeds in proving default, the plaintiff then must demonstrate 'that the default was excusable under the terms of the contract.'") (quoting Airport Indus. Park, Inc. v. United States, 59 Fed. Cl. 332, 338 (2004)); see also Kennedy v. United States, 164 Ct. Cl. 507, 512 (1964) ("If we hold that [the contractor] defaulted, we must determine whether the default was or was not excusable.").  The wrongful termination for default claim only implicates the contractor's right to obtain termination for convenience costs.  See Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir.) ("If the default was improper, the government is liable for the contractor's termination for convenience costs.") (citation omitted), modified on other grounds, 857 F.2d 787 (Fed. Cir. 1988).

III.     Analysis

A.     Plaintiff Was in Default on July 25, 2013

According to defendant, plaintiff was in default under the contract when it failed to complete the project by July 24, 2013.  See ECF No. 67 at 11.  The contract provided that:

> [T]he Contractor shall be required to (a) commence work under this contract within 15 calendar days after the dates the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 300 calendar days.

ECF No. 64 at 3.  The USACE issued its notice to proceed on September 27, 2012, which resulted in a required completion date of July 24, 2013.  See id.  Plaintiff admits that the contract work was not completed by that date.  See ECF No. 70 at 7 ("It is undisputed that State Corps did not complete the project by July 24, 2013, the established Contract completion date.").

Defendant argues that plaintiff's failure to complete the project by July 24, 2013, was alone sufficient to place plaintiff in default under the contract.  See ECF No. 67 at 15.  The default clause in the contract reads, in part, as follows:

> If the Contractor refuses or fails to prosecute the work for any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work . . . that has been delayed.

ECF No. 64-1 at 37 (emphasis added).

As the United States Court of Claims has held, "[t]ime is of the essence in any contract containing fixed dates for performance," and failure to meet that fixed date can therefore form a valid basis for default termination. DeVito v. United States, 413 F.2d 1147, 1154 (Ct. Cl. 1969). See also Empire Energy Mgmt. Sys., Inc. v. Roche, 362 F.3d 1343, 1354 (Fed. Cir. 2004) (holding that when time is of the essence in a government contract, the agency can terminate the contract for default when the contractor fails to meet the contract performance date). Here, not only does plaintiff admit that it failed to meet the contract completion date, plaintiff's delinquent performance was clearly identified as part of the contracting officer's termination decision. See ECF No. 59-1 at 68 (stating that as of November 18, 2013, plaintiff had "completed only 80 percent of the contract requirement," and that the contract had "a completion date of July 24, 2013").

The court agrees with defendant that the undisputed material facts demonstrate that plaintiff was properly considered in default the day after it failed to meet the contract performance date—July 25, 2013.[1]

### B.      Defendant Did Not Waive Plaintiff's Default

When a contractor defaults on a contract, that default may be waived by the contracting agency—expressly or through inaction. The Court of Claims outlined the circumstances under which the agency's inaction will result in a waiver as follows:

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

---

[1]      Defendant alleges that plaintiff breached the contract in a number of additional, material ways that would independently justify termination for default. See ECF No. 67 at 19-25. Because the court has concluded that plaintiff's failure to complete the contract by July 24, 2013, serves as a valid basis for the default termination, it does not reach the merits of these assertions.

DeVito, 413 F.2d at 1154.  The contractor bears the burden of proving the facts to support a finding that defendant waived the default.  See Indem. Ins. Co. of N. Am. v. United States, 14 Cl. Ct. 219, 223 (1988).  That burden is heavier "[w]here the right to terminate has been expressly reserved or when liquidated damages have been imposed by the non-breaching party."  Olson Plumbing & Heating Co. v. United States, 602 F.2d 950, 955 (Ct. Cl. 1979).  The issue of waiver applies to construction contracts only in "exceptional or rare circumstances."  Indemnity, 14 Cl. Ct.. at 224.  In the context of considering the issue of waiver, however, "whether a default termination is proper depends upon the facts and circumstances of each case."  Id. at 223 (citing Olson, 602 F.2d at 955).

In this case, the issue of waiver was first raised by defendant in its response and cross-motion for summary judgment.  See ECF No. 67 at 16.  Therein, defendant contends that because plaintiff did not argue that defendant waived plaintiff's default in its opening brief, plaintiff has effectively waived its ability to make such an argument. Id. (citing In re Gabapentin Patent Litig., 503 F.3d 1254, 1261 (Fed Cir. 2007)).  The case cited by defendant in support of its assertion does not assist the court on this point because Gabapentin involved an express waiver of a particular argument.  See Gabapentin, 503 F.3d at 1261.  To the court's knowledge, plaintiff has made no express statement disavowing an argument that defendant has waived its default.

In its response to defendant's cross-motion, plaintiff quotes several authorities discussing the concept of waiver, but does not explicitly argue that the facts of this case involve a waiver on the USACE's part.  Instead, plaintiff speaks in terms of election, arguing that "the Government elected to allow the Contract work to continue after the date of State Corps' alleged default."  ECF No. 70 at 7.  Plaintiff continues:

> To be clear, State Corps does not dispute that the Government reserved its right to terminate the Contract on the basis of the elapsed Contract completion date.  However, the Government did not take action to terminate or suspend the Contract at that time, but elected to allow the Contract work to proceed.

Id. at 7-8.  According to plaintiff, the result of such an election is that defendant is obligated to "pay for work performed by State Corps subsequent to the alleged breach." Id. at 8 (citing 13 Williston on Contracts § 39:23 (4th ed. 2000)).

Contrary to plaintiff's implicit assumption, however, an election to allow work to continue does not automatically equate to a waiver.  In Indemnity Insurance Co. v. United States, the court considered facts that it succinctly summarized as follows:

> Plaintiff has filed a motion for summary judgment requesting that [its] termination for default by the government of its construction agreement be

> converted to a termination for the government's convenience.  The plaintiff
> bases its motion on the following facts.  The original completion date passed
> without government termination of the contract and plaintiff continued to
> perform work which the government had knowledge of and encouraged.  The
> government did not establish a new completion date prior to the default
> termination.

14 Cl. Ct. at 220.  In that case, the government agreed to a period of forbearance so that
plaintiff could attempt to resolve deficiencies in its performance, but notified plaintiff
that "acceptance of any work [during the period of forbearance] would be for the purpose
of mitigating damages and that liquidated damages would continue to accrue."  Id. at 221.

In reaching its decision, the court in Indemnity observed that "a contracting officer
should not have to immediately terminate a contract, after a contractor's failure to meet a
delivery date, on pain of waiving the right to do so."  Id. at 226 (citation omitted).  The
court concluded that "the fact that the contracting officer did not immediately, after the
plaintiff's failure to meet the . . . completion date, act to terminate the contract for default
does not mean the government waived its right to do so, especially since the plaintiff was
advised that the government was preserving all of its rights and was considering
termination if certain conditions were not met."  Id.

The Court of Claims reached a similar conclusion in Olson.  In Olson, the court
reviewed a decision of the Armed Services Board of Contract Appeals, in which the
board determined that the government had not waived its right to terminate a contract.
When the plaintiff in Olson failed to meet the contract completion date, the government
did not terminate the contract for default, but it "sent plaintiff two letters stating that it
was not waiving its rights by permitting plaintiff to continue performance and that
liquidated damages would be assessed . . . until the date of completion."  602 F.2d at 953.
More than a year later, after plaintiff was repeatedly unable to complete its work, the
government terminated the contract for default.  See id. at 954.  The board upheld the
termination for default, holding that the government was "within its rights when it
terminated plaintiff for default because plaintiff had abandoned the contract and the
Government had not waived the due date."  Id.

Relying on an election theory, the plaintiff argued to the court that the board erred
because the government "lost its right to terminate the contract for default until a new
delivery date had been set because it permitted 13 months to pass after the due date and
before it terminated the contract, encouraged plaintiff to continue to perform, and did not
set a new delivery date."  Id. at 955.  The court found that defendant's termination
decision was proper, and that plaintiff had failed to carry its burden to demonstrate
waiver.  In reaching this conclusion the court noted that the government's "express
reservation of its rights and the assessment of liquidated damages surely made clear to
plaintiff that the Government was not excusing the breach."  Id.

18

As noted above, in order to show that the USACE waived its default, plaintiff must show both that:  (1) defendant "failed to terminate within a reasonable time after the default under circumstances indicating forbearance," and (2) plaintiff's reliance "on the failure to terminate and continued performance by [it] under the contract, with the Government's knowledge and implied or expressed consent."  DeVito, 413 F.2d at 1154. Plaintiff does not explicitly address either of these factors in the briefs it filed in this case. But whatever argument it might make to support the various aspects of this waiver test, it cannot plausibly argue that it relied on the USACE's failure to terminate in deciding to continue performance.

The undisputed material facts show that the USACE repeatedly and expressly reserved its right to both terminate the contract for default and to impose liquidated damages.  After plaintiff's failure to meet the July 24, 2013 contract completion date, defendant made its position clear to plaintiff on at least the following seven occasions:

(1)     On July 28, 2013, four days after plaintiff failed to timely complete the work, the contracting officer wrote to plaintiff, stating that "[s]ince State Corps has failed to perform within the time required by the terms of the contract, the Government is considering terminating said contract," and that the letter is intended as formal notice to plaintiff that the USACE intended to pursue the recovery of liquidated damages.  ECF No. 64-1 at 286.

(2)     On July 30, 2013, the contracting officer sent another letter repeating her statements that the project was overdue, that defendant intended to assess liquidated damages, and that defendant may terminate the contract for default.  See id. at 287-90.  That letter stated that "[t]he Government reserves all right under the contract, including the right to terminate for default if the late performance is unexcused."  Id. at 290.

(3)     On August 20, 2013, after receiving a proposed recovery plan from plaintiff, the USACE rejected the proposal as unrealistic, and stated:  "[a]lthough a modest time extension is under consideration by the Contracting Officer, you will likely continue to be in default and subject to liquidated damages," and that "Termination for Default is also being discussed with the possibility that your performance bond will be called."  Id. at 295.

(4)     On September 23, 2013, the contracting officer issued a show cause letter to plaintiff, which included the subject line "Show Cause Letter—Timeliness," stating that "[s]ince you have failed to perform within the time required by the terms of the Contract, the Government is considering terminating said contract pursuant to the Clause titled "Default" of the contract clauses."  ECF No. 64-2 at 11.  The letter also stated:

Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to this office, within ten (10) days after receipt of this notice. Your failure to present any mitigating circumstances with ten (10) days after receipt of this notice may be considered as an admission that none exist. Your attention is invited to the respective rights of the contractor and the Government under the contract clause titled "Default" and the liabilities that may be invoked in the event a decision is made to terminate for default.

Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services thereunder, will be solely for the purpose of mitigating damages, and is not to be construed as a waiver of any rights the Government may have under subject contract.

Id. at 12-13.

(5) On September 24, 2013, the contracting officer sent another letter to plaintiff noting plaintiff's deficient performance, stating that the USACE was considering default termination, and again stating that:

Any assistance given to you on this contract or acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

Id. at 15.

(6) Also on September 24, 2013, the contracting officer notified plaintiff of the USACE's "intention to begin assessing liquidated damages . . . at the rate of $4,694.00 per day for each calendar day following the contract completion date until the work is completed." Id. at 30. She also again repeated that the "Government reserves all rights under the contract, including the right to terminate for default if the late performance is unexcused." Id.

(7) On October 23, 2013, the surety expressed its willingness to negotiate an agreement by which it would take over responsibilities under the contract in order to mitigate its damages. See id. at 50-51. The USACE proposed to plaintiff that if plaintiff cooperated in the surety's takeover efforts, the USACE

20

would not terminate plaintiff for default.  See id. at 130 (plaintiff admitting this fact in response to defendant's request for admission).

As was the case for the plaintiffs in Indemnity and Olson, it is simply inconceivable that plaintiff could believe, after receiving the foregoing communications from the agency, that defendant's stated intentions are consistent with a finding of waiver.  Indeed it is difficult for the court to imagine how the agency could have made its position—that it considered plaintiff to be in default, to be in danger of having its contract terminated for default, and to be responsible for liquidated damages—any clearer.

As such, the undisputed material facts confirm that defendant did not waive plaintiff's default under the contract.

C.      Plaintiff's Default Was Not Excused

Defendant has met its burden to demonstrate plaintiff's default, and plaintiff has failed to demonstrate that defendant waived that default.  Thus, in order to avoid the consequences of its default—here termination of the contract—plaintiff must establish that its default was excusable.  See, e.g., Keeter Trading, 79 Fed. Cl. at 253 ("If the government succeeds in proving default, the plaintiff then must demonstrate 'that the default was excusable under the terms of the contract.'") (quoting Airport Indus. Park, Inc. v. United States, 59 Fed. Cl. 332, 338 (2004)); see also Kennedy, 164 Ct. Cl. at 512 ("If we hold that [the contractor] defaulted, we must determine whether the default was or was not excusable.").

Plaintiff argues that its default should be excused for either of two reasons.  First, plaintiff argues that the "contracting officer materially breached the contract by failing to pay significant amounts over an extended period of time in violation of the payment procedures in the contract."  ECF No. 58 at 6.  As a result, plaintiff claims, it "did not have the cash flow to fund performance of the Contract work."  Id. at 11.  Plaintiff states that "[t]he Government's breach of its payment obligations was the sole cause of State Corps' inability to proceed with the work at the time of the termination for default," and therefore, "the termination for default must be excused and converted to a termination for convenience."  Id.

And second, plaintiff claims that the contracting officer "failed to consider, in [her] Final Decision, or at any time, prior to the termination for default, State Corps' outstanding request for an excusable delay related to a change in the badging process that prevented State Corps' employees from gaining access to the site for performance of work."  Id. at 13.  Plaintiff alleges that changes to the badging process were made on August 7, 2013, and states that it notified the USACE of delays related to that change on three separate occasions in September 2013.  See id.  The failure to consider these delays

prior to termination, according to plaintiff, "legally constitutes an abuse of discretion and arbitrary and capricious behavior, which makes the termination for default invalid." Id.

Both of these arguments fail for the same reason.  Defendant admits that it did not pay the seventh invoice submitted by plaintiff in due course, and expressly took responsibility for any resulting interest and penalties.  See ECF No. 59-1 at 59-60.  The seventh invoice, however, was not submitted until September 8, 2013, and reflected a due date of September 22, 2013.[2]  See ECF No. 59-1 at 51-58.  Even assuming, as plaintiff has alleged, that defendant's delinquent payment resulted in plaintiff's inability to fund its work, see ECF No. 58 at 11, it could not possibly have caused its failure to meet the contract completion date, which passed two months before plaintiff expected the seventh payment from defendant.

Plaintiff's excuse related to delays due to changes in the badging process after August 7, 2013, is equally unavailing.  According to plaintiff's own version of events, the changes at issue were not instituted until two weeks after the contract completion date.  Thus, even if these alleged delays were legitimate, they simply cannot operate as a legal excuse for plaintiff's failure to complete the contract work by July 24, 2013.[3]

In its response to defendant's cross-motion, plaintiff makes an oblique reference to "excusable delays which prevented it from completing the project by the established Contract completion date."  ECF No. 70 at 25.  Plaintiff includes no substantive discussion of these alleged excusable delays, but instead presents the existence of such allegations as evidence of disputed material facts.  See id.  The record cites included in this section of plaintiff's brief refer to the delays caused by the August 7, 2013 changes in the badging process, see ECF No. 59 at 5, which the court has previously discussed, and

---

[2]   Defendant claims payment would have been due on September 23, 2013.  See ECF No. 67 at 35 n.7.

[3]   Plaintiff bases part of its argument in its motion for summary judgment on the contention that the contracting officer acted arbitrarily and capriciously because she did not address the delays related to the August 7, 2013 badging procedures in deciding to terminate the contract for default.  See ECF No. 58 at 11-13.  According to plaintiff, "[t]his failure legally constitutes an abuse of discretion and arbitrary and capricious behavior, which makes the termination for default invalid."  Id. at 13.  Defendant takes issue with the legal standard plaintiff urges the court to apply in this regard.  See ECF No. 67 at 45-48.  The court need not resolve the parties' disagreement as to the legal standard or its application to the present case.  As discussed more fully in the text accompanying this footnote, the conduct challenged by plaintiff, even crediting its version of events, is not material to the present analysis because it occurred after plaintiff failed to meet the contract completion date.

to several proposed findings of uncontroverted facts discussing plaintiff's June 13, 2013 letter to the contracting officer, see ECF No. 64 at 18; ECF No. 70 at 25.

In the June 13, 2013 letter, plaintiff provided the contracting officer with explanations of various delays in performance, but also states as follows:

> First of all, I would like to apologize on behalf of State Corps that it came down to us being issued a cure notice. This is our first Governmental contract in Qatar and we have always tried for successful completion of this project. This is no excuse for being behind on the schedule but unfortunately we had experienced some challenges at the start of the project which included getting the company registered in Qatar and developing our team there.
>
> . . .
>
> I have personally spoken with the project manager, John Hanen, and he is fully accepted the responsibility of the project being behind.

ECF No. 64-1 at 213-14. Plaintiff's recovery plan, which was attached to the letter, acknowledged that the "project is 3 week[s] behind schedule," but stated that "this recovery plan has been made in order for us to prove to our client that the project completion on 24th of July is undeniably possible." Id. at 216.

Plaintiff suggests that there is an issue of disputed material fact with regard to whether the delays outlined in the June 13, 2013 letter could form the basis of a valid legal excuse for its late performance. See ECF No. 70 at 25. While delays that occurred prior to June 13, 2013, certainly avoid the timing issue that plaintiff has with the excuses that form the primary basis of its argument, plaintiff has given the court no reason to doubt plaintiff's own statements—which appear in the very same letter—that there was "no excuse" for these delays, and that plaintiff's own project manager "fully accepted the responsibility for the project being behind." Id. at 213-14.

For these reasons, the court finds that the undisputed material facts support the conclusion that plaintiff's late performance was not excused.

IV.   Conclusion

The undisputed material facts show that plaintiff was in default as of July 25, 2013, that defendant did not waive the default, and that the default was unexcused. As such, defendant's decision to terminate the contract for default was proper, and defendant is entitled to summary judgment in its favor.

Accordingly, plaintiff's revised motion for summary judgment, ECF No. 58, is **DENIED;** and defendant's cross-motion for summary judgment, ECF No. 67, is **GRANTED**.

The court's conclusion that defendant properly terminated the contract for default may not end the inquiry in this case, however, as it does not speak to whether defendant owes plaintiff any additional payments.  Throughout their summary judgment briefs, the parties offer varying versions of the outstanding balance defendant may owe to plaintiff.  Those assertions, however, were made in the context of whether defendant's decision to withhold certain payments was a material breach of its obligations under the contract such that plaintiff's termination for default should be excused, and neither party has asked the court to make a final calculation of damages on summary judgment.  See ECF No. 58 at 10 (arguing that "the nonpayment by the Government of the $1.22 million provides a clear basis to overturn the Government's termination of State Corps based on a material breach of the Contract's payment provisions" and that the alleged breach "entitles State Corps to a conversion of the default to a termination to convenience"); ECF No. 67 at 26-44 (arguing the defendant's nonpayment of progress payments was either justified or not a material breach, and contesting the amount plaintiff claims is presently owed); ECF No. 70 at 15-17 (identifying various disagreements between the parties as to the amounts owed on the contract, while arguing that defendant's "withholding of a large amount of money over several months in contravention of the express terms of the Contract was a material breach"); ECF No. 75 at 16-17 (defendant noting that it has "not contended that a contractor could have no entitlement to a withheld progress payment—rather, the only issue currently before the Court is whether the nonpayment was a material breach, at the time of the defaults, as required to convert the default termination to a termination for convenience").

The court also notes that defendant claims, without explication, that "whether [plaintiff] is now entitled to any amounts that it claims it is due . . . and whether liquidated damages and retainage fully offset these amounts . . . would only be relevant to Case No. 16-1074."  Id. at 17.  By this statement, defendant seems to suggest that no determination of damages should be made in this case.

The court, therefore, directs the parties to **CONFER** and **FILE** a **joint status report**, on or before **March 15, 2019**, informing the court of the issues left to be resolved in this case, and proposing a plan for doing so.[4]  In particular, the court expects the parties to address the impact of the court's findings in this opinion on State Corps v. United States, Case No. 16-1074, with which the present matter has been informally

---

[4]    If the parties determine that additional issues are outstanding, they are encouraged to consider whether settlement discussions would be fruitful now that the court has determined that the default termination was proper.

consolidated.  <u>See</u> Case No. 16-1074, ECF No. 25 (amended scheduling order providing guidance on the informal consolidation).

   IT IS SO ORDERED.


          <u>s/Patricia E. Campbell-Smith</u>
          PATRICIA E. CAMPBELL-SMITH
          Judge